Mr. Justice Morris
delivered the opinion of the Court:
1. It is objected, in the first place, that the appellee, the complainant in the court below, is not a body corporate, and is not therefore entitled to maintain this suit, inasmuch as it has forfeited its charter by its failure to pay the annual license tax required by the laws of the State of West Virginia under which it was incorporated.
But we think this position to be wholly untenable. Under the decisions of the courts of West Virginia, which may well be taken as a guide in this regard, and which are in accord with the general tenor of judicial decision on the point, a charter of incorporation is not ipso facto abrogated or annulled by failure to pay a license tax, notwithstanding that the statute may provide that such failure shall work a forfeiture. Such failure, of course, will afford ground for a legal proceeding to vacate a charter; but it requires a legal proceeding, by way of' quo warranto or other equivalent process, to vacate a charter of incorporation. Mere proclamation by an' executive officer will not accomplish the result. Lumber Co. v. Ward, 30 W. Va. 43; Miller v. Coal Co., 31 W. Va. 836. See, also, U. S. Electric Lighting Co. v. Leiter, 19 D. C. 575, and Railroad Co. v. Fifth Baptist Church, 137 U S. 568.
Moreover, under the laws of West Virginia, even after *541 alleged forfeiture, a company may bring suit for the settlement of its affairs. Code of West Va., Ch. 53, Sec. 59.
And again the appellant here, having dealt with the appellee by taking its note and securities after the date when the alleged forfeiture is said to have occurred, is in no position to question the corporate capacity of the appellee. Close v. Glenwood Cemetery, 107 U. S. 466." In fact, if the contention were sustained, it might have serious results for the appellant; for then the appellant would have dealt with a fictitious person, and might be required to surrender the collateral security or its proceeds to those who had advanced it for the benefit of the supposed company, and yet possibly might not be able to recover the money with which it had parted. But we do not regard the contention as at all tenable.
2. In the second place, it is urged that the appellee, as complainant, had an adequate and complete remedy at law, and that therefore it had no standing in a court of equity. The argument here on behalf of the appellant is, that, if the sale of the certificates, stated to have been made on January 19, 1898, was valid, the complainant has nothing of which to complain; and that, if such sale was invalid, the remedy of the complainant was in a suit at common law to recover the difference between the amount received by the bank on account of the certificates and the amount of the indebtedness of the company to the bank at the time. But this position is no more tenable than the previous one. The suit is for discovery and an accounting, and for the cancellation and surrender of the notes. It does appear that the appellee knew precisely what amount of money was received on the certificates. It did not know what the expense was of collection, which was undoubtedly a proper charge against the fund. On the theory that the certificates were still in pledge until the date of payment and that there had been no valid sale of them to any one, *542 the complainant was plainly entitled to a discovery and accounting; and this could properly be had through a court of equity. And, of course, the matter of the cancellation and surrender of the notes was properly cognizable in equity. We think it very clear that only a court of equity could have given the proper relief in the premises.
3. The important question'in this case is that of the validity of the sale which the appellee claims to have made of the pledged certificates to itself on January 19, 1898. On the determination of this the whole controversy depends. All the other questions are subordinate and of minor importance.
Were it necessary, in the exercise of jurisdiction in this case, to go back to the beginning of the transaction, a court of equity might find it difficult to entertain a suit on behalf of the appellee in view of the fraudulent, and possibly even criminal manner in which the funds of the bank were first transferred to the use of the Construction Company. But the bank has chosen to condone the fraud. In view of the apparent irresponsibility of the Construction Company, it scarcely had any option to do otherwise than to affirm the transaction as a loan and to retain the securities for whatever it might afterwards realize from them. This has been done, and we are not required to go back of the 13th day of May, 1897, at which time the bank and the company came to su settlement of their previous transactions- and entered into a new arrangement, whereby, in consideration of the money previously received by the company from the bank, the latter took the note of the company and received the collateral security which has been mentioned. That the arrangement was yet unsatisfactory, that it was disapproved of by the Comptroller of the Currency, that the bank was thereafter constantly seeking to get back its money and constantly importuning the officers of the company to make some further settlement, which could only be, of course, either by the repayment of *543 the money or of some part of it or by giving additional or more satisfactory security, does not militate against the proposition that, on May 13, 1897, the bank, in contemplation of law, made a loan to the Construction Company, took its promissory note therefor, and received a deposit of certain receivér’s certificates as collateral security for the payment of such note. The relation of mortgagor and mortgagee, or of pledgor and pledgee, was thereby created between the parties; and their respective lights and duties were to be governed by the general rules of law applicable to that relation and by the special covenants of their agreement, not in violation of the general principles of law; for in the establishment of the relation of mortgagor and mortgagee covenants are sometimes made which the law will not tolerate, or which courts of equity, when they have cognizance of the matter, will not enforce or permit to be enforced. In fact, it may be said that the whole doctrine of equity on the subject of mortgages is based upon the theory to some extent that a court of equity will not permit the mortgage contract to be enforced according to its strict letter.
When we come to examine the contract in the present case which is embodied in, or rather appended to, the promissory note given by the Construction Company to the bank, we find «various incongruities and inconsistencies, and features of unusual harshness. While it is provided, in the event of the depreciation in value of the securities, and demand thereupon made for either a partial payment on account or the deposit of additional security, that the maker of the note shall have ten days within which to comply with the demand, yet in the far more important event of a sudden demand for the payment of the whole note, with a liability in the case of failure of immediate compliance for the immediate sale of the securities, no time at all is given. Then the provision that, upon demand made for the payment of the note and failure of immediate *544 compliance, the bank might sell the securities either at public or private sale, at the stock exchange or at its own bank, without notice of any kind of the time or place or manner of sale, and might itself become the purchaser, is of so shocking a character, so pregnant with the possibility of fraud and dishonesty, that a court of equity might well declare it to be absolutely null and void as against public policy. A court of equity will certainly require that, when such an authority to a mortgagee is sought to be exercised in accordance with its letter, the utmost fairness and good faith are to be observed, and the proceeds of such alleged sale must be the full market value of the securities.
The sale, which is claimed to have been had by the bank on January 19, 1898, may have been a wise precautionary measure to perfect the title of the bank, and incidentally the title of the appellee, and to guard against the contingencies of threatened litigation, obscurely intimated by the receiver while acting as intermediary between the company and the bank in the early part of that same month, but which, so far as the record shows, had no existence whatever except in his own imagination, or possibly in a sinister purpose to get possession of the certificates at a large discount. But as between the two parties to this suit, the mortgagor and mortgagee, it would be absurd to call by the name of sale the proceeding which took place at the banking house of the bank, on January 19, 1898, when the president of the bank, in the presence of two or three employees of the bank, who were attending at the time to their ordinary duties at their desks, without notice to any one or any possibility that any one else could become the purchaser, put up these securities for sale, and bid them in for the bank for the sum of $16,000. If he had merely gone to his bookkeeper and told him to enter these securities on his books as the property of the bank, and at the same time to enter a credit of $16,000 on the note, the proceeding would not have been more absurd. It is safe to say that the *545 elementary principles of equity and fair dealing were violated in this alleged sale. The certificates at the time were of the face value of upwards of $21,000; the money for their payment was at that moment in the registry of the court in Tennessee, and the bank had been officially advised that it was there; there was no difficulty in the way of its collection, and within a week it was in fact collected by the persons sent for the purpose by the bank. To uphold such a sale under such circumstances as against the mortgagor would be to convert the law into a mockery.
To this it may be also added that the negotiations of officers of the bank with officers of the Construction Company, both before and after the day of the alleged sale, with reference to the course to be pursued for the collection of the money, are not indicative of good faith on the part of the bank, if it was the purpose at that time to regard the alleged sale as foreclosing all the rights of the mortgagor in the premises, and not merely as a means of fortifying the position of the bank in the collection of the money. If the sale was intended only for the latter purpose, and the appropriation of the money by the bank to its own use was only an afterthought, the failure of the bank to inform the officers of the Construction Company of its occurrence until after the request for a settlement, was natural enough; otherwise, it might be regarded as almost a fraudulent concealment. - We think that there was no purpose on the part of the bank to deprive the Construction Company of its just rights, and that the purpose to insist upon the validity of the alleged sale was an afterthought, the result, as developed in the record, of the consideration of the great pecuniary loss sustained by the bank by the abstraction of so large a part of its available resources, whereby and for other similar losses it was compelled to go into liquidation.
But however-this may be, the sale in question can not be sustained upon any principle of equity; and it must be regarded, so far as the mortgagor is concerned, as an abso *546 lute nullity. No such sale was contemplated by the parties in their agreement; for it is not possible that there can be a private sale, in the sense of this agreement, where the mortgagee in its own office sells to itself without the presence of any other person, for an arbitrary figure fixed by itself.
4. There having been no valid sale of the securities, an account was proper, and the court below rightly referred the cause to the auditor to state an account. But it is urged, and this is the burden of the first assignment of error, that the court should not have so referred the cause without a preliminary decree to the effect that the complainant was entitled to an accounting. This is a mere technicality without substance. The order of reference was, by necessary implication, an adjudication that there should be an accounting.
5. The only remaining assignments of error that require to be noticed are based upon exceptions to the auditor’s report.
In stating the account between the parties the auditor charged the bank with the receipt of $21,105.84 as the proceeds of the certificates, less $325.96 for the cost and expense incurred in the collection on account of the sending of its two envoys to Tennessee, an item which the Construction Company agrees to be right and proper, thereby leaving the net amount of the collection to be $20,779.88; and he credited the bank with the amount of the two notes and interest, which was the sum of $18,634.97. The balance due to the complainant, therefore, he stated to be $2,144.91, as of the date of January 28,1898. Four other items of account were presented on behalf of the bank, which were not allowed. These were: (1) A charge of commissions amounting to ten per centum on the amount of the certificates collected, which charge was $2,110.58; (2) A claim for money paid to the Washington Savings Bank in respect of said collection, $320; (3) Another similar claim for money yet payable to the Washington Savings Bank on the same account, $52.66; *547 (4) For “expenses incurred by reason of the failure of the defendant to pay the notes on demand, being two per cent, (afterwards in the course of the auditing reduced to one per cent.) the bank paid for that amount of money to supply its immediate necessities to the extent of the defendant’s default on its note, $367.84 (but as reduced, $183.92).”
As to the items numbered one, two and three, they are so plainly inadmissible as to require no consideration from us. As to the fourth claim, that of $183.92, being the proportionate share of the percentage on the sum of one hundred thousand dollars which the bank was compelled to borrow on account of its pressing necessities, caused by the default of the complainant and other creditors, the auditor, in view of the circumstances, recommends it to the court, but does not allow it in his statement of the account. The court ignored the recommendation, and confirmed the report without any reference to it. Undoubtedly, if the Construction Company occupied the attitude of an ordinary debtor of the bank, we know of no rule of law or principle of equity that would sanction such a claim as this. But from the statement of the case it is apparent that the Construction Company does not occupy the place of an'ordinary debtor. In this connection it is justifiable to refer to the circumstances of the original transaction, and to the fact that in its inception the transfer of the funds of this bank to the Construction Company was not by way of a voluntary loan, but was a fraudulent abstraction of them; and that, in the injury which it did to the bank, the effect of the fraud was perpetuated to the end, notwithstanding that the bank was compelled by the force of circumstances to legitimate the transaction. In consideration of these circumstances and of the peculiar and extraordinary relations of the Construction Company, through its officers, to the bank, and not upon any supposed equity arising from the mere relation of debtor and creditor, we think that the auditor’s recommendation was founded upon principles of justice, and that it should be carried into *548 the account. The principle will here apply that he who seeks equity must do equity.
The appellant’s claim, therefore, for reimbursement in this connection to the amount of $183.92 should be allowed, and the amount due from it to the appellee should be reduced to that extent. The net balance due will then be $1,960.99, as of the date of January 28, 1898. With this modification the decree appealed from should be affirmed.
We are of opinion that the decree of the Supreme Court of the District of Columbia in the premises, so modified as aforesaid, should be affirmed, with costs. And it is so ordered